## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AUDREY SWANN**, <br><br>                    Plaintiff, <br><br> v. <br><br> **OFFICE OF THE ARCHITECT OF THE CAPITOL**, <br><br>                    Defendant. | Case No. 13-cv-01076 (CRC) |

### MEMORANDUM OPINION

After receiving an anonymous tip, the Inspector General of the Office of the Architect of the Capitol ("AOC") conducted an investigation into whether Audrey Swann, an AOC electrician, had misrepresented her education and experience levels when she initially applied for her position. The investigation concluded that Ms. Swann had in fact overstated her qualifications in her employment application. Upon receiving the Inspector General's report and Swann's response, the Architect of the Capitol terminated her on the basis of the report's findings. In this lawsuit, the fourth in a series of employment-discrimination actions Swann has filed against her former employer, Swann claims that AOC actually terminated her in retaliation for having pursued the prior claims. Finding that Swann has presented no evidence to suggest that the Architect of the Capitol's termination decision was based on a retaliatory motive, the Court will grant summary judgment in favor of AOC.

**I.     Background**

AOC terminated Audrey Swann from her position as an electrician effective April 30, 2012. Def.'s Mot. Summ. J. Ex. 7. The termination had its roots in an anonymous letter, sent a few months earlier to AOC's Office of the Inspector General ("OIG"), claiming that Swann had falsified her resume when she applied for employment with AOC by claiming electrical

experience and education she did not have. Following receipt of the letter on January 12, 2012, OIG launched an investigation: It dispatched an investigator, conducted interviews with Swann's co-workers and previous employers, and issued subpoenas to the community college where Swann claimed to have earned a certification and a local union with whom Swann claimed an affiliation. See Def.'s Mot. Summ. J. Ex. 1, at AOC000059. OIG also interviewed Swann herself in February 2012, with her lawyer present, where it provided her the opportunity to substantiate the claims of experience and education made in her original application.

Following the investigation, on March 21, 2012, OIG produced an interim report summarizing its findings. See generally id. The report found that Swann was not able to provide proof of some of her claimed past employment. Id. at AOC000072–73. She also "failed to provide any documentation or witnesses to support her alleged employment with" a local electrical company. Id. at AOC000063. "The investigation substantiated that [she had] falsified her experience and [previous] position title." Id. at AOC000059. It also found, through contacting the community college's registrar, that although Swann claimed to have completed an Electrical Helper "Certificate," she had merely taken two electrical classes and had not achieved certification. See id. at AOC000065.

After receiving the interim report, the Architect of the Capitol, Stephen Ayers, sent Swann a letter stating that she was being terminating for falsifying aspects of her application. See Defs.' Mot. Summ. J. Ex. 2. The letter informed Swann that she would nonetheless first be afforded the opportunity to show there was insufficient cause to terminate her employment. In a separate letter sent on the same date, Swann was informed that she was being placed on temporary administrative leave. See Defs.' Mot. Summ. J. Ex. 3. AOC made a copy of OIG's report available to Swann on April 2, see Defs.' Mot. Summ. J. Ex. 4, and her attorney responded eight days later with a letter attempting to rebut the allegations, see Defs.' Mot. Summ. J. Ex. 6.

Despite the rebuttal, Ayers decided to leave his decision to terminate Swann in place. See Defs.' Mot. Summ. J. Ex. 6; Decl. of Stephen Ayers ¶¶ 4–5. Swann then initiated this suit alleging that the decision to terminate her was motivated by her employer's intent to retaliate against her for filing claims of discrimination against AOC in the past.[1] See Compl. ¶¶ 1–2.

Swann's current theory of retaliation boils down to this: AOC terminated her because of OIG's report; OIG issued its report after conducting an investigation instigated by an anonymous letter; and the author or authors of the anonymous letter harbored retaliatory animus against her. Therefore, Swann now contends, the intent of the letter-writers can be attributed to AOC, which should be held liable for her termination under what is commonly referred to as the cat's-paw theory of liability in employment-discrimination cases. This theory or allegations supporting it, however, appear nowhere in Swann's complaint or in her opposition to AOC's motion to dismiss.

In ruling on AOC's motion to dismiss, the Court relied on Brady v. Office of the Sergeant at Arms, 520 F.3d 490 (D.C. Cir. 2008), to hold that the primary issue in this case was not whether Swann had in fact falsified her application for employment—an accusation she denies— but whether the AOC decision-maker honestly and reasonably believed as much based on the independent OIG report. In Brady, an employee of the Sergeant at Arms of the U.S. House of Representatives was demoted following a purported incident of sexual harassment. Although the

---

[1] Swann has filed three previous suits against AOC alleging discrimination based on gender and race, as well as retaliation. See Swann v. Office of the Architect of the Capitol, No. 09-cv-1586 (D.D.C. Feb. 8, 2013) ("Swann I") (granting summary judgment), aff'd, 598 Fed. App'x 13 (D.C. Cir. 2015) (per curiam); Swann v. Office of the Architect of the Capitol, No. 11-cv-00419 ("Swann II") (granting summary judgment), aff'd, 598 Fed. App'x at 13; Swann v. Office of the Architect of the Capitol, 73 F. Supp. 3d 20, 32 (D.D.C. 2014) ("Swann III") (dismissing or granting summary judgment as to all counts), aff'd, No. 15-5001, 2015 WL 5210251, at *1 (D.C. Cir. Aug. 18, 2015) (per curiam).

employee protested that the incident never occurred and that the corresponding investigation was tainted by racism, he conceded that his employer honestly believed the incident occurred, and he produced no evidence that his employer's belief was unreasonable. Id. at 496. The D.C. Circuit therefore upheld the district court's grant of summary judgment in favor of the employer. Id.

The Court found this case to be analogous to Brady in the sense that Swann claimed that OIG's investigation was flawed and that AOC's response to OIG's investigation was inappropriate under the circumstances. The Court also acknowledged Swann's claim that she was denied certain procedural rights in the lead-up to her termination, including a hearing and access to the evidence against her. Consequently, the Court denied AOC's motion to dismiss—except with respect to a single hostile-work-environmental claim—and allowed limited discovery to proceed in three areas, consistent with Brady: (1) AOC's understanding of and response to the OIG report, including its handling of other similar personnel decisions; (2) the basis for AOC's decision to terminate Swann, including any information it may have relied on outside the OIG report; and (3) and the process afforded Swann by AOC in connection with her termination. Following the close of discovery, AOC moved for summary judgment on all counts.

**II.     Standard of Review**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the burden to demonstrate the "absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To overcome a motion for summary judgment, the non-moving party must "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). A

dispute is genuine only if a reasonable fact-finder could find for the non-moving party; a fact is material only if it is capable of affecting the outcome of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Laningham v. U.S. Dep't of Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" Scott v. Harris, 550 U.S. 372, 378 (2007) (alteration in original) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).

### III. Analysis

Swann claims that AOC took a number of actions against her, and ultimately terminated her, in retaliation for engaging in a variety of protected equal-employment-opportunity activity. All employees in AOC, including Swann, are protected from retaliation by the Congressional Accountability Act ("CAA"), 2 U.S.C. § 1317. "[T]hough the Act's anti-retaliation provision . . . contains no express tie to other statutes, courts routinely refer to Title VII case law in evaluating claims of retaliation under the CAA." Joyce v. Office of Architect of Capitol, 106 F. Supp. 3d 163, 168 (D.D.C. 2015). Under Title VII, "retaliation claims must be proved according to traditional principles of but-for causation." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013); see also Rattigan v. Holder, 982 F. Supp. 2d 69, 82 (D.D.C. 2013) ("[U]nder the Supreme Court's recent ruling in Nassar, it is now clear that a Title VII retaliation claim cannot rely on a mixed motive theory."), aff'd, 780 F.3d 413 (D.C. Cir. 2015). To prevail, then, Swann must show that AOC would not have taken the challenged adverse employment actions against her were it not for her participation in protected activity.

Courts properly analyze claims like Swann's, in which a plaintiff offers no direct evidence of retaliation, under the familiar McDonnell Douglas burden-shifting framework. See

Hampton v. Vilsack, 760 F. Supp. 2d 38, 50 (D.D.C. 2011) (citing Gaujacq v. EDF, Inc., 601 F.3d 565, 577 (D.C. Cir. 2010)), aff'd, 685 F.3d 1096 (D.C. Cir. 2012). Under this framework, the plaintiff may establish a prima facie case of retaliation by showing "(1) that [s]he engaged in a statutorily protected activity; (2) that [s]he suffered a materially adverse action by h[er] employer; and (3) that a causal link connects the two." Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009). Once the plaintiff makes out a prima facie case, the burden shifts to the employer "to articulate some legitimate, non[retaliatory] reason" for the adverse action. McDonnell Douglas, 411 U.S. at 802. If the employer satisfies that burden, then "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence." Jones, 557 F.3d at 677. AOC has provided a legitimate, non-retaliatory reason for terminating Swann: that she falsified parts of her employment application and lied about her credentials. The Court will therefore proceed to analyze whether a reasonable jury could conclude, based on all the evidence, that AOC's asserted reason was not the actual reason and that AOC intentionally retaliated against Swann for engaging in protected activity. See Brady, 520 F.3d at 494.

    A.    Count One

In Count One, Swann alleges that OIG's investigation "of an anonymous report/complaint and issuance of its March 21, 2012 Interim Report were unlawful retaliatory employment activity." Compl. ¶ 76. AOC asks the Court to grant it summary judgment on this count on the grounds that (1) the investigation and Interim Report do not constitute adverse employment actions; (2) those actions were taken by OIG, which operates independently of AOC when conducting investigations, and not by AOC itself; and (3) Swann has produced no evidence

6

to show that OIG's proffered reason for initiating the investigation and issuing its ensuing report was pretext for retaliation.

As an initial matter, AOC correctly observes that Swann fails to respond in any fashion to the argument that the investigation and interim report do not constitute materially adverse employment actions.  See Def.'s Reply 2–3.  The Court therefore considers her to have conceded those points.  See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), aff'd, 98 Fed. App'x 8 (D.C. Cir. 2004) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

Independent of this concession, however, Swann cannot succeed on Count One for two reasons.  First, the record is devoid of any evidence that OIG acted with a retaliatory motive when it began investigating Swann or when it issued an unfavorable interim report.  Indeed, Swann points to none and even grants that there is "no evidence that . . . the OIG acted out of retaliation."  Pl.'s Opp'n 8.  Second, although the Inspector General "report[s] to[] and [is] under the general supervision of[] the Architect of the Capitol," 2 U.S.C. § 1808(c)(1)(A), OIG is an "independent objective office" within AOC, id. § 1808(b).  As relevant here, the Architect of the Capitol and his office "have no authority to prevent or prohibit the Inspector General from . . . initiating, carrying out, or completing any audit or investigation . . . [or] issuing any report."  Id. § 1808(c)(1)(B)(i), (iii).  It would make no sense, then, to attribute the investigation and ensuing report to AOC and hold that office liable for "tak[ing]" these actions in "reprisal against" Swann.  Id. § 1317.  The Court will therefore grant summary judgment in favor of AOC as to Count One.

B.      Counts Two, Three, Four, and Eight

In Counts Two, Three, Four, and Eight, Swann alleges that AOC retaliated against her in connection with her termination and placement on administrative leave before her termination. In assessing Swann's claim that AOC retaliated against her, the primary factual issue is "whether [AOC] honestly and reasonably believed that the underlying [misconduct] occurred." Brady, 520 F.3d at 496. Swann does not dispute, let alone identify evidence to contest, that Architect of the Capitol Ayers honestly believed she had falsified her employment application. She contends only that it was unreasonable to have relied on the OIG report that led AOC to believe that she had falsified her application. See Pl.'s Opp'n 20. As in Brady, however, Swann has not produced "evidence sufficient to show that [AOC's] conclusion was dishonest or unreasonable, Brady, 520 F.3d at 496, despite her opportunity to pursue discovery into the basis for AOC's decision. In addition, Swann's newly-presented theory that Ayers acted as the unwitting "cat's paw" for an agent of AOC who did harbor retaliatory animus fails under a proximate-cause analysis and also lacks any support in the record. Therefore, the Court will grant summary judgment in favor of AOC on Counts Two, Three, Four, and Eight.

1.      Whether Swann Can Show that AOC's Conclusion Was Not Honest or Reasonable

Swann contends that Mr. Ayers's reliance on OIG's report was not reasonable because she had already been "vett[ed]" before beginning her employment by the "Employment Classification Branch . . . of then [sic] Human Resource Management Division." See Pl.'s Opp'n 20. During this "vetting," she claims, "nothing was found in [her] employment record and/or education/training record . . . to be false and/or adverse to her hiring," which, she contends, constitutes "direct, undisputed, unimpeachable, competent and insurmountable evidence that [she] did not falsify information on her applications for employment . . . ." Id.

Moreover, she maintains that Ayers should have recognized the OIG report as plainly deficient because it did not reference this vetting or indicate that OIG had even contacted the Employee Classification Branch in the course of its investigation.

Fatal to her argument on this point is Swann's failure to identify evidence of any such "vetting" ever having taken place.  AOC correctly notes that nothing in the record supports the idea that its human resources division "investigates [or] verifies all information submitted by new hires."  Def.'s Reply 4.  In addition, without any evidence that the human resources division investigates AOC's new employees in this manner, there would be no reason to expect the OIG report to mention "that [it] made inquiries of" this nature to the human resources division in the course of conducting its own investigation.  Pl.'s Opp'n 21.  There is thus nothing unreasonable about relying on a report that does not reference such inquiries.

Again, Swann does not claim that Ayers did not honestly believe she had falsified her employment application.  Nor does she advance any substantial argument or offer any evidence to show that his reliance on the OIG report, which formed the basis for that belief, was unreasonable.  Therefore, "although [Swann] asserts that the accusations and ensuing investigation were . . . tainted" by retaliatory animus and that the alleged falsification "did not occur," she has "failed to put forward sufficient evidence for a reasonable jury to find that the employer's legitimate, non-[retaliatory] reason was not the actual reason and that the employer intentionally" retaliated against her.  Brady, 520 F.3d at 496–97.

### 2.   Whether Swann Can Prevail Under a Cat's-Paw Theory

Perhaps recognizing the lack of evidence that Mr. Ayers himself harbored any retaliatory animus, Swann falls back on the so-called cat's-paw theory of liability.  The Supreme Court has "held that a plaintiff could prevail on such a theory 'if [1] a supervisor performs an act motivated by [retaliatory] animus, [2] that is intended by the supervisor to cause an adverse employment

9

action, and . . . [3] that act is a proximate cause of the ultimate employment action." Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 297 (D.C. Cir. 2015) (second alteration in original) (quoting Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011)), cert. denied, No. 15-1104, 2016 WL 828853 (U.S. Apr. 18, 2016). Swann cannot establish proximate cause, however, and this theory—offered now for the first time—lacks any support in the record.

Swann may not proceed on a cat's-paw theory based on the anonymous letter because the letter is not a proximate cause of her termination or any other materially adverse action against her. True, "proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'" Staub, 562 U.S. at 419 (quoting Hemi Group, LLC v. City of New York, 130 S. Ct. 983, 989 (2010)). Yet if an "employer's investigation results in an adverse action for reasons unrelated to [a] supervisor's original biased action . . . , then the employer will not be liable." Id. at 421. In other words, for information provided by a biased individual to "remain a causal factor" in the termination of an employee in this situation, the "independent investigation [must have] take[n] it into account without determining that the adverse action was, apart from the supervisor's recommendation [or report], entirely justified." Id. Under this standard and on this record, no reasonable factfinder could infer that the anonymous letter was a proximate cause of Swann's injury. As a result, Swann cannot prevail on her cat's-paw theory.

Swann might argue that the anonymous letter was a but-for cause of her termination, in that she would not have been fired had the letter not been sent because OIG would otherwise never have conducted the investigation that served as the basis for her termination. To succeed on her retaliation claims under a cat's-paw theory, though, Swann must be able to establish proximate causation, not just but-for causation. Here, the letter did not proximately cause Swann's termination because the record is clear that OIG did not *rely* on the anonymous letter or

10

the information contained in it when OIG concluded that Swann had misrepresented herself. Rather, OIG relied solely on the findings of its own investigation: the results of its interviews, phone calls, and review of documentation related to Swann's previous education and employment. OIG indicated that various accusations in the letter had been substantiated, but never used the letter or anything in it as support for its findings. There is no dispute that the letter spurred the OIG to investigate, but Swann can point to nothing in the OIG report or anywhere else in the record that even suggests that the letter or its contents influenced the outcome of OIG's investigation. So not only did OIG independently reach the conclusion that Swann had falsified her application; it did not take the anonymous letter into account in reaching that conclusion. Accordingly, even if the letter itself was tainted by retaliatory animus, OIG's report was not likewise tainted and, therefore, neither was AOC's decision to terminate Swann.

It also bears mentioning that Swann cites no evidence that the anonymous letter—the act that she claims was directly motivated by retaliatory animus—was written or sent by a *supervisor*, as Staub requires. See 562 U.S. at 422. And Swann identifies no evidence that the author of the anonymous letter, whoever he or she may be, was motivated by retaliatory animus. Although the Court holds that Swann's claims fail on proximate-cause grounds, both of these points would be fatal to her claims as well.[2]

---

[2] It is true that the Court did not allow discovery into these areas of inquiry, but Swann provided no indication that she needed discovery for this purpose. Indeed, neither the Court nor AOC had any inkling that Swann intended to pursue a cat's-paw theory until she raised the issue in her opposition to AOC's summary judgment motion. If Swann knew prior to the Court's entry of the discovery order that she wanted or intended to pursue this theory, it would have been wise to raise the issue. Similarly, if she determined subsequent to the Court's order that she wanted to pursue this theory, she could easily have asked the Court to modify its order. What Swann cannot do, however, is to suggest at the eleventh hour that AOC is liable under a particular theory, identify no evidence supporting that theory, and then complain that she did not have the opportunity to conduct discovery to test her theory.

Burley v. National Railroad Passenger Corp., on which Swann relies heavily, is not to the contrary. In Burley, a train engineer who had been disciplined for a safety violation sued his employer, Amtrak, for race discrimination and attempted to proceed in part on a cat's-paw theory of liability: Even though the Amtrak officials who disciplined him indisputably did not know of his race, they relied on an investigation conducted by the engineer's supervisor, who allegedly was biased against the engineer because of his race. That "theory fail[ed]," the D.C. Circuit held, because of "the absence of evidence raising a reasonable inference that [the supervisor] was motivated even in part by racial discrimination." 801 F.3d at 297, 301. Here too, the plaintiff identifies no evidence that the ultimate decision-maker *or* the investigating entity acted with any prohibited motive. No reasonable jury could find AOC liable on a cat's-paw theory under these facts.[3]

    C.    Counts Five, Six, Seven, Nine, and Ten

Swann also alleges that AOC violated her right to constitutional due process in order to retaliate against her for engaging in protected activity. See Pl.'s Opp'n 7–8. Specifically, she

---

[3] The Court would also be remiss not to mention Swann's most prominent recurring argument: that a communication by Mr. Ayers to Swann and the Notice of Termination addressed to Swann "were both executed by auto pen revealing hat [sic] Architect Ayers, at best, served as an unwitting agent of retaliation and 'cat's paw.'" Pl.'s Opp'n 16; see also id. at 17 ("Architect Ayers was nothing if not robotic and a 'cat's paw' for other agents of retaliation. . . . Further compare and consider the one hundred per cent mirror images of Architect Ayers [sic] auto pen signature appearing on his April 23, 2012 letter to Plaintiff's Counsel, . . . his auto pen signature appearing on his Declaration submitted in his support of the Defendant's instant Motion for Summary Judgment, . . . and his auto pen signature . . . contained in . . . a letter sent to the Plaintiff . . . .").

It is difficult to tell whether Swann's counsel intends to advance a serious argument on this ground. In any event, the Court will clear up any confusion: The use of an electronic signature to sign Ayers's correspondence to Swann simply has no bearing on any material issue in this case. Nor does the fact that then–Deputy General Counsel Kevin Mulshine initially drafted the correspondence that Ayers ultimately signed. But see Pl.'s Opp'n 16 (citing Pl.'s Ex. 1).

12

claims that AOC "deprive[d] [her] of her entitlement to a due process entitlements [sic] and a due process hearing pursuant to [AOC's Human Resources Manual] Chapter 752" in connection with her termination (Counts Five and Nine); refused "to provide [her] of [sic] the evidence and documentation relied upon by and used as support" for her termination (Counts Six and Seven); and denied her the opportunity to respond to a "new charge" that supposedly was used as the basis for her termination (Count Ten).[4]

To this Court's knowledge, Swann's retaliatory-deprivation-of-due-process claim is novel in this Circuit. Swann identifies no case holding that the denial of any constitutional right is *per se* a materially adverse employment action within the meaning of Title VII's anti-retaliation provision. Nor does she cite any case law holding that the types of actions she complains of—that is, failure to hold a formal hearing or to disclose evidence underlying an investigative report—can constitute materially adverse employment actions in the retaliation context. But assuming Swann's theory is viable in this regard, her retaliation claims nevertheless fail because there is "no evidence that Stephen Ayers," whom Swann holds responsible for denying her a hearing and not providing her with requested documentation, "acted out of retaliation." Pl.'s Opp'n 8.

---

[4] Review of the record indicates that there is in fact no "new charge" supporting her termination to which Swann was denied the opportunity to respond. Rather, in Ayers's letter of April 23, 2012 reaffirming his March 30 decision to terminate Swann, Ayers merely "note[d]" Swann's admission in her statement to OIG that her "employer compensated her in cash 'under the table,' that is, in violation of laws requiring the payment (both by her and her employer) of taxes to federal and state tax authorities." Def.'s Mot. Summ. J. Ex. 7. Ayers clarified that "[e]ven in the absence of this admission of apparently unlawful tax evasion, [his termination] decision would stand." Id. Although he stated that this admission "is another reason to remove her from employment with the AOC," id., the context makes clear that Swann's apparent act of tax evasion had nothing to do with the ultimate termination decision. That decision was based on the OIG's report dealing with Swann's purported misrepresentations, a decision that Ayers reaffirmed his April 23 letter. Id. ("There is no reason presented in [Swann's counsel's] response to my removal letter that convinces me that my original decision was wrong.").

Just as important, Swann premises this set of retaliation claims on a deprivation of constitutional due process, but the record shows that she was not denied any due process. "In order to establish a Fifth Amendment [due-process] . . . claim based on termination from employment, a plaintiff must make two showings. First, a plaintiff must demonstrate that [s]he has a 'property interest in continued employment.'" Solomon v. Office of Architect of Capitol, 539 F. Supp. 2d 347, 350 (D.D.C. 2008) (quoting Orange v. Dist. of Columbia, 59 F.3d 1267, 1274 (D.C. Cir. 1995)). Such "property interests 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' Second, a plaintiff must demonstrate that [s]he was deprived of the process [s]he was due." Id. (quoting Orange, 59 F.3d at 1274). Swann falls short in both regards.

First, a reasonable fact-finder could not conclude that Swann had a property interest in continued federal employment under the circumstances of this case. "[A] property interest is implicated only if [Swann] had a 'legitimate claim of entitlement' to [her] position based on an independent rule or understanding of law." Twist v. Meese, 661 F. Supp. 231, 233 (D.D.C. 1987) (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)), aff'd, 854 F.2d 1421 (D.C. Cir. 1988). Swann "fails this test because [s]he was an 'excepted service' employee under 5 U.S.C. § 2103(a) . . . ." Id. In general, "[e]xcepted service employees who are not veterans lack any statutory entitlement to their position that could generate a protected property interest." Id.; see also Garrow v. Gramm, 856 F.2d 203, 204–09 (D.C. Cir. 1988) (same). "All employees of the AOC, including [Swann], are designated by statute to be part of the Excepted Service. . . . Employers are entitled to dismiss members of the Excepted Service without cause, prior notice, a termination hearing or an opportunity to appeal." Commeree v. Hantman, No. CIV. 97-0242 (TFH), 1999 WL 1611325, at *5 (D.D.C. Oct. 28, 1999) (citing Garrow, 856 F.2d at 205), aff'd, 25 Fed. App'x 1 (D.C. Cir. 2001).

Swann's status as an excepted-service employee does not end the matter, though. There is no dispute that "[a] statute can establish a property right by qualifying the terms of employment by, for instance, mandating that an employee cannot be discharged without cause." Id. But it is not the case that "only formal regulations or statutes can create property interests. It is established that a legitimate expectation of continued employment can be created by both 'rules' (statutes or regulations) or 'understandings' (express or implied contracts). Thus, statements in employee handbooks and manuals can create a property interest in continued employment" as well. Vanover v. Hantman, 77 F. Supp. 2d 91, 102 (D.D.C. 1999) (citing Hall v. Ford, 856 F.2d 255, 265 (D.C. Cir. 1988)), aff'd, 38 Fed. App'x 4 (D.C. Cir. 2002). Swann claims that Chapter 752 of AOC's Personnel Manual provides her with this property interest. See Def.'s Mot. Summ. J. Ex. 9 (Chapter 752) (assuring "employees that they will be afforded due process in all disciplinary actions proposed or effected against them"). Indeed, at least one court in this district had "no difficulty finding that the policy and implementing procedures of [a prior version of] Chapter 752 gave [a] plaintiff an objectively reasonable expectation that he would be terminated only for cause and that [the] plaintiff thus had a protected property right in his employment." Vanover, 77 F. Supp. 2d at 102–03. The problem for Swann is that, on its face, Chapter 752 does not apply to or afford protections to employees in "[a]ctions separating an employee for reasons not known to the Office at the time of appointment which, if known, would have precluded employment, *including providing false information during the employment process.*" Def.'s Mot. Summ. J. Ex. 9, at AOC000006 (emphasis added). AOC's manual does not create a reasonable expectation for employees that they will be afforded any kind of notice or hearing before being terminated for providing false information on an employment application. Swann therefore cannot avail herself of the protections provided or the expectations created by Chapter 752.

15

Second, despite lacking a constitutionally protected property interest, Swann received at least the minimum process that conceivably could have been due before she was deprived of her continued federal employment. Due process requires that "a deprivation 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" Solomon, 539 F. Supp. 2d at 350 (quoting Cleveland Bd. of Educ., 470 U.S. at 542). "The opportunity for hearing must offer an 'opportunity to present reasons, either in person *or in writing*, why the proposed action should not be taken . . . .'" Id. (emphasis added) (quoting Cleveland Bd. of Educ., 470 U.S. at 546). The record clearly reflects that Ayers provided Swann with advance notice of her termination and gave her an opportunity to address the basis for the termination before it took effect. See Def.'s Mot. Summ. J. Ex. 2 (March 30, 2012 Termination Letter) ("If you wish to show that there is insufficient cause to terminate your employment, you must respond to this notice, with the evidence that you did not falsify your application, within 10 workdays of your receipt of this notice. This is your opportunity to show that my decision is not justified and to give the reasons supporting your contentions."). In addition, it is undisputed that AOC made available to Swann the OIG report that served as the basis for her termination and that Swann received this report. See Def.'s Statement Undisputed Material Facts ¶ 2; Pl.'s Opp'n Def.'s Statement Material Facts 7. By providing Swann with notice of the accusations against her as well as all investigatory findings regarding that accusation, and by allowing Swann a reasonable opportunity to respond to those accusations and findings, AOC met any due-process obligations it might have had prior to terminating her employment.

No reasonable jury could find that AOC violated Swann's constitutional right to due process or that AOC, to the extent it did, violated Swann's rights in order to retaliate against her. Summary judgment for AOC is thus appropriate.

## IV. Conclusion

For the foregoing reasons, the Court will grant AOC's motion for summary judgment as to all counts. An Order accompanies this Memorandum Opinion.

CHRISTOPHER R. COOPER  
United States District Judge

Date:  May 10, 2016